82 N.Y.2d 509 (1993)
626 N.E.2d 630
605 N.Y.S.2d 655
The People of the State of New York, Respondent,
v.
Patsy Mitchell, Appellant.
Court of Appeals of the State of New York.
Argued October 6, 1993.
Decided November 18, 1993.
Donohue, Sabo, Varley & Armstrong, P. C., Albany (Kenneth G. Varley of counsel), for appellant.
Robert M. Morgenthau, District Attorney of New York County, New York City (Zachary Weiss and Patricia Curran of counsel), for respondent.
Judges SIMONS, BELLACOSA and LEVINE concur with Judge SMITH; Judge TITONE dissents and votes to reverse in a separate opinion in which Chief Judge KAYE and Judge HANCOCK, JR., concur.
*510 SMITH, J.
The issue in this case is whether a prosecutor is required to present exculpatory statements of a defendant to the Grand Jury in addition to the inculpatory statements which were submitted. Because we hold that the prosecutor was not required to present such statements on the facts presented here, we affirm the order of the Appellate Division.
On November 13, 1990, shortly before 9:30 P.M., police emergency telephone number 911 received a call reporting a stabbing at a Manhattan apartment. Responding to the call, Police Officers Dauphnee and Krinke approached the door to the apartment, and Officer Dauphnee heard "yelling" from inside. When the officers knocked on the door, defendant, *511 Patsy Burgess Mitchell, who appeared to be intoxicated, opened it and allowed the officers, as well as emergency medical technicians, to enter. Once inside, Officer Dauphnee saw defendant's husband, Sam Mitchell, lying on the floor with stab wounds to his chest. In response to Officer Dauphnee's inquiry as to what happened, defendant stated, "[I] stabbed him because he was trying to beat on [me,] * * * he was cheating on [me] with a white woman[, and] he was a demon [and] a devil." When asked where the knife was, defendant pointed to the kitchen table. Defendant was arrested and detained at her apartment for approximately 30 minutes while Officer Dauphnee waited for his supervisor.
Upon arrival at the police station, defendant was unruly, yelling repeatedly that she had stabbed and killed her husband and rendering futile attempts to read Miranda warnings to her. According to Detective Louis Torrellas, defendant was agitated, screamed that she stabbed and killed her husband, and stated, "Sam was no good, Sam had the devil." She claimed that Sam treated her wrong and that he "fell on the knife." Given defendant's agitated state and the officers' inability to administer Miranda warnings to her, the officers placed defendant in a holding cell until the following morning. Defendant's husband died during the night.
The next morning, while being transported by Officer White from the holding cell to Central Booking, defendant was "boisterous," stating that she had stabbed her husband, that she and her husband had gone to the Bronx to have a few drinks, that her husband waited until he got home to "start his s____," that her husband was evil, and that she was trying to be peaceful. Defendant asked Officer White whether her husband would live. Officer White stated that he did not know. Defendant then stated that she did not stab her husband, that he fell on the knife, and that he did so to get back at her. Officer White asked her, "Why are you lying? You just spent the past couple of minutes telling me that you did stab him." Defendant then stated, "Yeah, I stabbed that mother f____, he should have stayed with that b____ on 167th Street."
At Central Booking, defendant was given her Miranda warnings and questioned about the incident. Defendant stated that during the course of a three-hour period, she and Sam walked, drank beer and wine and made various stops before reaching their apartment. At the apartment, they began *512 arguing and fighting when, during the struggle, she noticed a knife in Sam's hand. A portion of defendant's transcribed statement reads:
"Sam was holding the * * * knife in his left hand. I grabbed his hand, we were close to each other, and struggling. The knife was pointing toward his side. We both had our hands on the knife. Then I felt the knife go into him. At first he stood there, I yelled `Sam,' he didn't say anything. I pulled the knife back, his hand still on the knife. Sam laid on the floor. I bent down to see if he was bleeding. When he was on the floor I noticed the blood. I ran and called 911. Then I wiped the blood off the knife and put the knife on the sink. Then the police came. I told them what happened, and they took me to the precinct."
After defendant's account of the incident was transcribed, it was read back to her, and signed by all the parties present. Defendant also gave a videotaped account of the incident.
At the Grand Jury proceeding, the prosecution did not present any of the arguably exculpatory statements made by defendant before Miranda warnings were given except for the statement of the defendant to the police at the scene that she had stabbed the deceased while he was trying to beat her. Specifically, when Officer Michael Dauphnee was asked whether he had a conversation with defendant when she opened the door, he responded:
"Upon entering the apartment, I observed a male black lying on the floor. And I asked Ms. Mitchell what happened. And she stated that she stabbed him because he was trying to beat on her. When I asked her where the knife was, she pointed out the knife on the kitchen table."
The statements made by defendant after Miranda warnings were given were also not presented to the Grand Jury. The Grand Jury returned an indictment, charging defendant with manslaughter in the first degree.
Supreme Court dismissed the indictment because the prosecutor did not provide the Grand Jury with defendant's written or videotaped exculpatory statements, or charge the Grand Jury on the defense of justification. That court granted the People leave to re-present their case to another Grand Jury. The Appellate Division reversed, on the law, reinstated the *513 indictment, and remanded the matter to Supreme Court for further proceedings (183 AD2d 503). Based on its interpretation of CPL 190.30 (1), that the statute would bar defendant's exculpatory statements at trial as inadmissible hearsay and that the same prohibition should apply in the context of statements before the Grand Jury, the Appellate Division determined that Supreme Court erred in its conclusion that the People were required to present defendant's exculpatory statements. Defendant appeals pursuant to leave granted by a Judge of this Court.
Defendant argues that the prosecutor failed to make a fair presentation of the available evidence to the Grand Jury and should have presented her exculpatory statements to the Grand Jury. The People assert that trial rules of evidence are applicable in a proceeding before a Grand Jury, and since a defendant's out-of-court statements constitute hearsay, the People were not required to present them.
CPL 190.30 (1) states, "Except as otherwise provided in this section, the provisions of article sixty governing rules of evidence and related matters with respect to criminal proceedings in general, are, where appropriate, applicable to grand jury proceedings." In addition to this provision, CPL 190.65 (1) requires "legally sufficient," and "competent and admissible" evidence in Grand Jury proceedings (see also, CPL 70.10 [1]). Other than the specific exceptions to this general principle delineated by CPL 190.30 (2) through (7), deviation from this principle is limited. Thus, the general criminal trial court evidentiary rules normally apply to Grand Jury proceedings. These standards were met in the Grand Jury proceedings here.
Applying these standards to this case, the People were not required to introduce defendant's statements at issue in the Grand Jury. The exculpatory statements were not a part of a single statement in which inculpatory and exculpatory thoughts were expressed (see, People v Isla, 96 AD2d 789 [prosecutor omitted part of sentence in defendant's confession where defendant stated that he fired gun in self-defense]). As this Court noted in People v Brewster (63 N.Y.2d 419, 422), "The proper purpose of an indictment is to bring a defendant to trial upon a prima facie case which, if unexplained, would warrant a conviction".
The dissent's conclusion that the Grand Jury proceeding was unfair is untenable. This is particularly true since defendant *514 had the absolute right, upon waiving immunity, to testify before the Grand Jury and to present exculpatory versions of the facts (see, CPL 190.50).
Defendant's reliance on People v Pelchat (62 N.Y.2d 97) is misplaced. Defendant argues that the prosecutor's function is not that of seeking convictions, but to insure "that justice is done" (id., at 105). In Pelchat, the police officer testifying at the Grand Jury proceeding misperceived the prosecutor's question and named the defendant as one of the individuals he observed transporting contraband at the stakeout site. The officer was under the impression that the prosecutor had asked for the names of the individuals arrested at the site. This Court held that because the officer informed the prosecutor of his error and the prosecutor, notwithstanding the officer's revelation, continued to act upon the indictment, dismissal of the indictment was necessary. That decision was appropriate where the Grand Jury was actually indicting the defendant based upon information the prosecutor knew to be false. Here the prosecutor did not seek the Grand Jury's indictment based upon false information nor was his conduct otherwise unfair.
Defendant's reliance on People v Valles (62 N.Y.2d 36) and People v Lancaster (69 N.Y.2d 20, cert denied 480 US 922) as requiring a justification charge is also misplaced. In Valles, primarily distinguishing between charge requirements for exculpatory and mitigation defenses, this Court held that in a prosecution for murder, the prosecutor was not obligated to submit the mitigating defense of extreme emotional disturbance to the Grand Jury. We distinguished the obligation of the prosecutor when an exculpatory defense was available and intimated that an exculpatory defense charge should be submitted where such defense is involved. In People v Lancaster, however, we indicated, "Valles does not require that every complete defense suggested by the evidence be charged to the Grand Jury; rather `whether a particular defense need be charged depends upon its potential for eliminating a needless or unfounded prosecution'" (People v Lancaster, 69 N.Y.2d 20, 27, supra, quoting People v Valles, 62 N.Y.2d 36, 38, supra). The Court explained that where a defense of justification was established by the evidence, a charge concerning that potential defense would be required because the defendant's conduct could no longer be considered criminal (id., at 27-28). The Court indicated, however, that the evidence must establish that defense, requiring more from a defendant than a mere *515 allegation. Here, the evidence before the Grand Jury was not sufficient to require a justification charge.
As we indicated in Lancaster (supra) the People maintain broad discretion in presenting their case to the Grand Jury and need not seek evidence favorable to the defendant or present all of their evidence tending to exculpate the accused (id., at 25-26). Defendant failed to exercise her right to bring exculpatory evidence to the Grand Jury's attention by her own testimony or that of others testifying on her behalf (see, People v Lancaster, 69 N.Y.2d 20, 26, supra; CPL 190.50 [5], [6]). In addition, defendant submitted at least three different accounts of the events surrounding her husband's death. The People were not obligated to present every version to the Grand Jury.
Accordingly, the order of the Appellate Division should be affirmed.
TITONE, J. (dissenting).
Following defendant's arrest, she gave a detailed statement to police in which she indicated that the victim had been stabbed during the course of a struggle that was initiated when the victim brandished a knife. The majority holds that the prosecutor who presented the People's case to the Grand Jury had no obligation either to present this exculpatory evidence or to advise the Grand Jury on the justification defense. This holding is objectionable because its underlying rationale is obscure and it utterly ignores the prosecutorial duty of fairness that this Court has previously recognized. Because I conclude that that duty was breached in this case in a manner that both significantly prejudiced the accused and impaired the Grand Jury's ability to perform its essential function, I dissent from the majority's holding.
Initially, the Appellate Division's conclusion that the prosecutor was not required to introduce defendant's statements because they were inadmissible hearsay was fallacious. Whether or not the rule against hearsay is strictly applicable to Grand Jury proceedings,[1] that rule did not prohibit the *516 People's use of defendant's statement here. It is well established that "the admissions of a party-opponent may be introduced without satisfying any of the requirements for declarations against interest" (2 McCormick, Evidence § 316, at 336 [Practitioner's 4th ed]). Further, "while frequently admissions are against interest when made, they need not be and may, in fact, have been self-serving" (id.). Indeed, the contrary rule would unnecessarily burden the People because it would even preclude the use of a suspect's false exculpatory statements as part of the People's evidence-in-chief at a criminal trial.
As applied to this case, these elementary principles mean that the People were entitled to introduce all of the statements made by defendant as part of their Grand Jury case against her. Since they were made by the prosecution's "party opponent"  the target of the Grand Jury presentment  they were admissible under the hearsay exception for party admissions and there was no bar to their introduction by the People in the Grand Jury.
Similarly unpersuasive is the majority's somewhat cryptic analysis based on the evidentiary rules governing Grand Jury proceedings. The majority cites and describes the "standards" established by the provisions of CPL 70.10 (1), 190.30 (1) and 190.65 (1) and asserts that "the general criminal trial court evidentiary rules normally apply to Grand Jury proceedings" (majority opn, at 513). However, the majority never explains how those standards and rules preclude the introduction of defendant's otherwise admissible statement or excuse the prosecutor's failure to introduce them here. In the absence of a valid articulable evidentiary justification for the prosecutor's actions, the focus of the inquiry must be on whether the obligation of prosecutorial fairness imposed a duty to introduce defendant's exculpatory statements under the circumstances of this case. Citing People v Isla (96 AD2d 789), the majority has answered that question in the negative on the ground that the statements "were not a part of a single statement in which inculpatory and exculpatory thoughts *517 were expressed" (majority opn, at 513). However, the prosecutor's duty of fair dealing is certainly not limited to avoiding the indiscretion for which the prosecutor in Isla was chastised. Nor is it confined to the precise obligation identified in People v Pelchat (62 N.Y.2d 97, 105)  to refrain from using false information to obtain an indictment  as the majority suggests. Those specific prosecutorial peccadillos were merely the factual backdrop that prompted the Pelchat Court and the Isla Court to articulate the general principle that prosecutors conducting Grand Jury proceedings have an obligation to proceed with at least a measure of candor and fairness. The obligation itself was never meant to be defined strictly in terms of the factual settings in which it was first considered (see, People v Lancaster, 69 N.Y.2d 20, 26). The law governing the ethics of public officers is neither so trivial nor so arbitrary.
As was acknowledged in People v Pelchat (62 N.Y.2d 97, 105, supra), the prosecutor's duty of fairness is premised on the "familiar doctrine that a prosecutor serves a dual role as advocate and public officer [and is] charged with the duty not only to seek convictions but also to see that justice is done." Critical to an understanding of this duty is the relationship that exists between the important function served by the Grand Jury in our system and the prosecutor's unique role in the Grand Jury's execution of that function. The Grand Jury exists to protect citizens from needless and unfounded prosecutions as well as to investigate crimes (see, e.g., People v Lancaster, supra, at 25; People v Ford, 62 N.Y.2d 275, 282; People v Iannone, 45 N.Y.2d 589, 594). For the most part, the Grand Jury fulfills this responsibility passively, by sifting and evaluating the evidence presented to it by the prosecutor. Thus, as a practical matter, the Grand Jury ordinarily relies on the prosecutor to apprise it of all of the facts it needs to determine whether an indictment should issue. In this regard, the prosecutor's office operates as a filter through which the material that the Grand Jury will use to make its determination must pass.
It is clear that the People have broad discretion in presenting their case to the Grand Jury and that they are not obligated either to search for evidence favorable to the defense or to present all of the evidence in their possession that might be favorable to the accused (People v Lancaster, supra, at 25-26). However, there are some circumstances in which the exculpatory evidence is so essential to a complete understanding *518 of the case that the prosecution's failure to disclose it can actually prevent the Grand Jury from functioning as an intelligent and informed decision-making body. In such cases, withholding the evidence precludes the Grand Jury from performing its essential role as a bulwark against prosecutorial excess (see, People v Lancaster, supra, at 25). Those are the cases in which the duty of fair dealing is operative.
Manifestly, this case presents a prime example of when the duty of fair dealing requires the People to make full disclosure to the grand jurors of the exculpatory evidence they possess. Defendant's transcribed account of the incident (quoted at majority opn, at 512), which represents the only account by an eyewitness, suggests either that the victim was killed accidentally or that the accused acted in self-defense after the victim came at her with a knife. The suggestion that the justification defense was implicated is particularly significant because "whenever justification is sufficiently interposed by the defendant, the People must prove its absence to the same degree as any element of the crime" (People v McManus, 67 N.Y.2d 541, 546-547). Further, justification is a defense, not an affirmative defense, and, as such, specifically permits the use of force under certain statutorily defined circumstances. Thus, if the use of physical force is shown to have been justified, the conduct is not criminal at all. "[S]uch conduct [is] entirely lawful" (id., at 546). As we noted in People v Lancaster (supra, at 27-28), this is one of those cases in which prosecution may be "needless" and a fully informed Grand Jury is essential so that the merits of the People's case can be intelligently evaluated.
Moreover, when combined with the way in which the other evidence was presented, the prosecutor's failure to disclose defendant's exculpatory statements so distorted the case against her as to make a fair Grand Jury assessment all but impossible. The prosecutor elicited from the arresting officer that defendant had made jealous remarks indicating a motive to harm the victim. Additionally, he elicited that defendant had shown no signs of injury at the time of her arrest, thereby suggesting that there had been no real struggle and that defendant had been the aggressor from the outset.
Even more significantly, as a result of the testimony of two police officers, the Grand Jury was exposed to evidence that defendant had made one inculpatory statement and one statement that had ambiguous implications. The arresting officer *519 testified that when he first arrived at the scene of the incident, defendant stated: "I stabbed him because he tried to beat on me." Another officer testified that he heard defendant screaming at the precinct that she had stabbed and killed her husband. Viewed in the light of defendant's detailed statements about how she had attempted to grab the victim's knife and how the knife had entered his side as the couple struggled, these earlier fragmented declarations may have seemed to the grand jurors to be the relatively innocuous ravings of a hysterical woman fresh from a shocking and horrifying event. However, viewed in isolation and without benefit of the subsequent statements, they could only have been seen as damning admissions of defendant's own guilt.[2]
Finally, the distortion of the process arising from the prosecutor's omission of defendant's exculpatory statements is made evident even by the majority's own rationale for affirmance. No one disputes that a justification charge would have been required under the rationale in People v Lancaster (supra) if defendant's exculpatory statements had been placed before the Grand Jury. The majority's sole reason for concluding that such a charge was not required in this case is that there was insufficient evidence before the Grand Jury to warrant the charge. Although that conclusion could fairly be disputed on its merits,[3] its legal accuracy is less important than is its value as an eloquent demonstration of how important defendant's statements were to a fair evaluation of the events underlying the charges  and of how damaging the omission of those statements was to the integrity of the Grand Jury's deliberative process.
In sum, whether the stabbing was a deliberate and criminally culpable act or was instead an accidental or justifiable one was the question that lay at the heart of this prosecution which arose out of a violent domestic melee. Yet, by picking and choosing among defendant's own statements and presenting *520 a highly selective version of the evidence, the prosecutor managed to effectively eliminate that question from the grand jurors' consideration. As a consequence, the Grand Jury process was hopelessly skewed and the resulting indictment was fatally defective. Accordingly, I would reverse the order of the Appellate Division and reinstate the Supreme Court order dismissing the indictment.
Order affirmed.
NOTES
[1] Neither CPL 70.10 (1) nor CPL 190.65 establish that the rule against hearsay is to be strictly applied in Grand Jury proceedings. Read together, those statutes merely provide that the evidence necessary to sustain an indictment must include as a minimum competent and admissible proof to support every element of the offense charged as well as to establish reasonable cause to believe that the accused is the person who committed that offense. CPL 190.30 (1), on which the Appellate Division relied, provides that, with certain enumerated exceptions, the provisions of CPL article 60, including CPL 60.10 (invoking the civil rules of evidence), apply to Grand Jury proceedings. However, as the Practice Commentary observes, it is "an oversimplification * * * to conclude that New York grand jury rules of evidence are identical to those at trial save for the [enumerated exceptions]" (Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 190.30, at 242). Accordingly, the Appellate Division's blanket assumption that the rule against hearsay should be rigidly applied in Grand Jury proceedings is questionable.
[2] Contrary to the majority's assertion (majority opn, at 515), defendant's collective statements did not contain "at least three different accounts of the events surrounding her husband's death." Although defendant alternatively told the police that the victim had fallen on the knife to get back at her and that she had stabbed him, neither of these statements are fundamentally inconsistent either with each other or with the more detailed account of events defendant later gave, particularly when viewed in light of the distraught and confused state in which defendant made the statements and the emotional complexity of the circumstances leading up to the stabbing.
[3] Arguably, defendant's statement that she had stabbed the victim because he "beat on" her was sufficient to warrant a justification charge.